625 So.2d 377 (1993)
STATE of Louisiana, Plaintiff-Appellee,
v.
Kenneth & Shirley LONG, Defendants-Appellants.
No. CR93-142.
Court of Appeal of Louisiana, Third Circuit.
October 6, 1993.
*378 Clifford Royce Strider III, for State of Louisiana.
Elizabeth L. Hall, for Kenneth & Shirley Long.
Before DOUCET, KNOLL and DECUIR, JJ.
KNOLL, Judge.
On May 11, 1990, the State charged defendants, Kenneth and Shirley Long, by a bill of information with committing arson with the intent to defraud, a violation of LSA-R.S. 14:53. Defendants waived their right to trial by jury. After a bench trial, the trial court found defendants guilty as charged. The sentencing court sentenced defendants to 5 months in the custody of the Department of Corrections. The sentence was suspended and the sentencing court placed defendants on 5 years active supervised probation on the conditions that defendants serve 30 days in the parish prison, pay a fine of $1,000 and court costs of $106.50, serve 500 hours of community service, pay $120,000 in restitution, refrain from criminal conduct, and pay a $20 monthly supervision fee.
On appeal, defendants allege 4 assignments of error. However, defendants only briefed two assignments of error. Accordingly, in conformity with the Uniform Rules, Courts of Appeal, Rule 2-12.4 we consider the 2 unbriefed assignments of error abandoned. The remaining assignments of error allege insufficiency of evidence and ineffective assistance of counsel.[1] We affirm.

*379 SUFFICIENCY OF THE EVIDENCE
Defendants contend that the evidence was insufficient to support their convictions, and that the circumstantial evidence relied upon by the trial court did not exclude every reasonable hypothesis of innocence.
Arson with intent to defraud is defined in LSA-R.S. 14:53 as the setting fire to, or damaging by any explosive substance, any property, with the intent to defraud.
When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The fact finder must weigh the respective credibility of the witnesses, and the appellate court should not second guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983).
Incorporating the rule of circumstantial evidence found in LSA-R.S. 15:438 with the Jackson standard, an appellate court must determine that when viewing the evidence in the light most favorable to the prosecution, a reasonable trier of fact would have concluded beyond a reasonable doubt that every reasonable hypothesis of innocence has been excluded. State v. Porter, 454 So.2d 220 (La. 3rd Cir.), writ denied, 457 So.2d 17 (La.1984), cert. denied, 469 U.S. 1220, 105 S.Ct. 1205, 84 L.Ed.2d 347 (1985); State v. Morris, 414 So.2d 320 (La.1982). Additionally, circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982).
On November 20, 1989, defendants' home burned in the early morning hours. While the undisputed cause of the fire is arson, the question of whether defendants are the arsonists is at issue in this case.
Adrion Doiron, the chief of the Volunteer Fire Department for the City of Woodworth, was the first to respond to the fire. A motorist had reported the fire to Woodworth Chief of Police Calvin Watts at approximately 3:40 a.m. Doiron circled defendants' home to determine what type of fire was involved and to plan his attack. He found a free burning fire in the rear utility room and a free burning surface burn on the exterior wall adjacent to the master bedroom. All doors were deadbolted and had to be forced open with a sledgehammer. Likewise, all windows were locked, except one window to the utility room which the fire seemed to have blown out.
Several occurrences indicated arson via use of an accelerant. For instance, instead of requiring the usual 1,500 gallons of water to contain the fire, this fire required 38,000 to 40,000 gallons. Also, the fire in the utility room would restart after being extinguished. Moreover, the pattern of burning on the exterior wall, a separate surface burning, indicated the use of accelerants.
After being notified by Doiron, Idal Guillot of the State Fire Marshall's Office deemed the fire a result of arson. Daniel Snow, a fire investigator with INS Investigation Bureau, Inc., was informed of a bomb threat defendants received on November 17, 3 days prior to the fire. A person called the Longs' residence and left a message to the effect that a bomb had been planted 2 years earlier and was set to explode at 6:00 p.m. that evening.
Snow felt that the fire originated at 2 pointsthe utility room and the outer wall of the master bedroom. He found no evidence of a bomb, Molotov cocktail, or other explosive device, but suspected that accelerants were splashed on the outer walls and ignited. He also excluded an accidental fire from a kerosene heater which was in the utility room, because the most intense fire was on the wall opposite the heater at floor level. George Hero, an electrical engineer, reported that the fire was not electrical in origin.
Snow analyzed 2 samples of debris from the utility room and rear porch area adjacent to the master bedroom wall and found volatile residue of a straight run petroleum *380 distillate. Straight run petroleum distillates include gasoline, kerosene, diesel fuel, and lighter products such as paint thinner and napthas. Although defense counsel presented evidence that certain household products commonly found in utility rooms are flammable, the record is void of evidence that any of these items were present in the Longs' utility room. Snow found 2 Coleman fuel cans in the backyard. Shirley Long explained in a deposition that they may have had Coleman fuel cans in their backyard for camping.
Defendants were not at home the night of the fire because of the bomb threat they had received on November 15, 1989. Officer Gilbert Benoit of the Woodworth Police Department was called to defendants' home around 4:00 p.m. on November 15th to listen to the threat which had been left on defendants' answering machine. Officer Benoit did not call the Rapides Parish Bomb Squad because the call seemed to be a prank call by "a kid trying to impersonate an adult." Defendants left their home to stay with Mrs. Long's mother, who lived nearby. Occasionally, they returned home to wash clothes, bathe, or retrieve clothing. At 3:22 a.m. on the morning of the fire, Chief of Police Watts stopped Kenneth Long for speeding. Kenneth was travelling his usual route to Lecompte at the time he usually picked up newspapers for his daily paper route. Chief Watts could not determine whether Kenneth was coming from the direction of his (Long's) home or the home of his (Long's) mother-in-law. Chief Watts merely warned Kenneth for speeding. He testified that Kenneth did not act unusual.
Kenneth proceeded to the area where he picked up the newspapers every morning. Officer Francis Naquin, aware of Kenneth's usual whereabouts, went to inform Kenneth about the fire. When he arrived, Kenneth appeared to be sleeping in his vehicle, waiting for the papers. Kenneth became distraught when he heard the news of the blaze. Officer Naquin drove him to the house.
On the afternoon of November 20, 1989, Charlene Builliard Rector, a claim representative of Hanover Insurance Company, the Longs' fire insurer, took statements from defendants. In response to Rector's inquiries about their financial affairs, both business and personal, the Longs replied that they were not having financial trouble, but were merely revamping and adjusting. The record, however, shows that the Longs were in severe financial distress.
Numerous liens and lawsuits had been filed against the Longs and their business; likewise, they had a few outstanding lawsuits against others. Shirley had been released from her position as a paralegal with the law firm of Provosty, Sadler and DeLauney in June of 1989 owing the firm near $24,000 on a promissory note. Also, the state contractor's board had revoked Kenneth's contractor's license, and he could no longer contract work valued over $50,000. At the time of the fire, Shirley was self employed as a free lance paralegal and as a salesperson for motivational tapes. The record does not show any income from paralegal work, but shows that she had sold 2 tapes at $600 each. Although she stated that she made $365 on these tapes, the record does not show whether she deducted the $100 monthly payment due on the $1,000 loan she had taken out to purchase her inventory. Kenneth, at this time, was delivering newspapers for the Alexandria Town Talk, clearing $600 to $700 per month.
Elaine Setliff, a counselor for the Family Debt Counselling Service, testified that defendants became clients in late August of 1989. On the basis of their reported income, defendants could pay only 60% of their monthly debts, or $2,770, plus $2,000 in monthly house notes. Defendants had agreed to pay the $2,000 toward their house notes, and to pay Family Debt Counselling $2,770 on the tenth of each month for distribution by the counselling service to the Longs' creditors. Defendants paid the debt service on September and October 10, but never met their November deadline, despite an extension of time until November 20 in which to pay. The Longs did not disclose the $24,000 note owed the law firm to Family Debt Counselling Service. In addition to numerous other debts, in March of 1989, Shirley borrowed $29,000 for a new Cadillac.
*381 The total insurance coverage for defendants' home was $216,000: $120,000 for the house; $72,000 for contents; and $24,000 for living expenses. Defendants claimed as a loss in the fire $7,800 in cash plus coins, loose diamonds, and other jewelry. Although defendants took the bomb threat seriously enough to remove themselves from the home, they did not remove the substantial amount of cash and jewelry they allegedly had in the home. Of course, any paper money would burn without a trace, and no remnants of jewelry or coins were found. Shirley phoned the insurance company on September 26, 1989, to inquire whether the home owner's policy covered cash losses. Defendants' debts exceeded the amount of insurance coverage.
Defendants claim that third persons set the fire. After carefully reviewing the record, we find that the trial court did not err in rejecting the alternative hypothesis suggested by defendants.
Defendants point to Anthony Henry Rougeou as a possible culprit to the arson. At the scene of the fire, Kenneth argued with Rougeou, a volunteer fireman and a vocal opponent of a proposed bond issue, which the Longs supported. Kenneth accused Rougeou of setting the fire. All but one defense witness testified about the hotly contested school bond election in which Shirley was very active. At a meeting in the town of Woodworth, Rougeou and Kenneth exchanged words after Rougeou questioned Shirley's support of the tax. All witnesses who were questioned about the incident testified that it was not violent and ended peacefully and quickly. Rougeou denied setting the fire, and he and his son, both volunteer firemen, risked their physical well-being to fight the fire.
Defendants also suggested that an unknown person set the fire by breaking the window to the rear utility room, splashed in some flammable material and set fire from the outside, or that this unknown person set fire only to the outside of the house and the heat transferred to the inside and ignited some type of flammable household products in the utility room. We find that the testimony of Daniel Snow, the private fire investigator, refutes the Longs' contention. Snow explained why his findings did not support this claim. Normally, vandals, thieves or vengeful persons will break into a house, set fires in garbage cans, dumpsters or on the outside, then run away without bothering to lock or even close the doors. In this case, all doors were locked, only defendants had keys, and no signs of forced entry were present. The glass from the only broken window indicated that it had blown outward from the fire; no glass was found inside of the house, which could have evidenced a break-in. Although the expert witnesses conceded as a possibility that the outside fire could have been lit and then the heat transferred to the utility room igniting flammable household products, they rejected the theory as improbable. Instead, they opined that the fire originated inside the utility room and on the porch. They further theorized that someone entered the home, doused the utility room with an incendiary, locked the doors behind him, and then lighted the inside and the outside of the house on fire after also dousing it with an incendiary.
The record supports a finding that defendants had a strong financial motive to burn their house. Although defendants attempted to discount the seriousness of their financial distress, the evidence indicates that they were undergoing serious financial difficulties, and the insurance proceeds would have covered many of their debts.
Defendants also contend that the evidence against Shirley was not sufficient to prove her guilt, citing a lack of evidence to prove that she had the specific intent to commit arson with the intent to defraud. Shirley's state of mind however, can be inferred from her actions and transactions with the insurance company after the fire. She was not completely truthful in describing the family's financial condition at the time of the fire and had failed to include a large debt to the law firm with which she was previously employed. As a principal to the crime, Shirley can be convicted if the evidence proves that she was concerned in the commission of the crime, whether present or absent, and whether she directly committed the act constituting the offense, aided and abetted in its *382 commission, or directly or indirectly counselled or procured another to commit the crime. LSA-R.S. 14:24. We find that Shirley's inculpatory actions concerning the bomb scare and her family's debt problems are sufficient to establish that she was a principal in the crime of committing arson with the intent to defraud.
After thoroughly reviewing the record, we agree with the trial court that the State proved defendants' guilt of the crime of committing arson with the intent to defraud, and that the circumstantial evidence excluded every reasonable hypothesis of innocence. Thus, we find this assignment of error meritless.

EFFECTIVE ASSISTANCE OF COUNSEL
Defendants claim that they were denied effective assistance of counsel during the trial of this matter. Initially, we note that although the claim for ineffective assistance of counsel is properly raised in an application for post-conviction relief, we may address the issue in this case in the interest of judicial economy because the record contains sufficient facts to decide the issue. See, State v. Seiss, 428 So.2d 444 (La.1983).
Defendants' rights to the assistance of counsel are guaranteed by both the federal and state constitutions. In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court elaborated that the benchmark for judging any claim of ineffectiveness of assistance of counsel must be whether counsel's conduct was so deficient as to undermine the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. In considering allegations of ineffectiveness, defense attorneys are entitled to a strong presumption that their conduct fell within the broad range of reasonable professional assistance. See, United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); State v. Brooks, 505 So.2d 714 (La.), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987).
Defendants allege several deficiencies in trial counsel's representation. They claim that counsel failed to sufficiently investigate the case and prepare a defense; failed to meet with defendants enough times; and failed to retain an expert in fire investigations. Defendants, however, have failed to explain how these actions were deficient and how the actions prejudiced them.
Defendants also contend that trial counsel was ineffective because he failed to interview the 7 defense witnesses before trial and failed to contact additional potential witnesses who were also threatened and intimidated over the school bond issue. The defense presented 7 witnesses, 5 of whom testified about community reactions to the school bond issue. Defendants failed to show how their case was prejudiced by defense counsel's failure to interview defense witnesses before the trial or not calling additional witnesses.
Defendants also suggest that trial counsel could have called Pat Eversull, an accountant, to testify that tax liens had been paid. Considering the overall bleak financial situation shown by the record, we cannot find that the failure to present evidence on the tax lien amounted to ineffective assistance of counsel.
Next, defendants maintain that their trial counsel was ineffective because he failed to introduce the police report prepared by Chief Watts, which allegedly indicated that Kenneth exhibited no nervousness when stopped for speeding shortly before the fire was reported. Introduction of the report would be simply cumulative as counsel's cross-examination of Chief Watts showed that when stopped, Kenneth did not act unusual in any way.
Finally, objectionable information in the PSI report, which incorrectly stated that Shirley Long had outstanding warrants against her for issuing worthless checks, could have only prejudiced her in the length of sentence she received. Appellate counsel was enrolled as counsel of record immediately after sentence was pronounced and trial counsel withdrew. Appellate counsel, however failed to file a timely motion to reconsider sentence, which precludes appellate review of the sentence. Furthermore, defendants *383 failed to convince us that this action prejudiced Shirley Long.

ERROR PATENT
A review of the record reveals one error patent. LSA-C.Cr.P. Art. 930.8 provides that at the time of sentencing, the trial court shall inform defendants of the prescriptive period for post-conviction relief. The record shows that the trial court did not so inform defendants. This defect has no bearing on whether the sentence is excessive, and this is not grounds to reverse the sentence or remand the case for resentencing. LSA-C.Cr.P. Art. 921. The three year prescriptive period does not begin to run until the judgment is final under LSA-C.Cr.P. Art. 914 or 922, so prescription is not yet running. Apparently, the purpose of the notice of Article 930.8(C) is to inform defendants of the prescriptive period in advance; thus, we direct the district court to inform defendants of the provisions of Article 930.8 by sending appropriate written notice to defendants within 10 days of the rendition of this opinion and to file written proof that defendants received the notice in the record of the proceedings. State v. Fontenot, 616 So.2d 1353 (La.App. 3rd Cir.1993).

DECREE
For the foregoing reasons, we affirm defendants' convictions and sentences. Additionally, we direct the trial court to inform defendants of the prescriptive period for post-conviction relief by sending appropriate written notice to defendants within 10 days of the rendition of this opinion and file written proof of notice in the record of the proceedings. Costs are assessed to defendants, Shirley and Kenneth Long.
AFFIRMED.
NOTES
[1] Defendants filed a motion to view the presentence investigation report which we previously deferred to the merits. The apparent need for the presentence investigation report is to seek review of the sentences. However, as defendants failed to file a motion to reconsider sentence as required by LSA-C.Cr.P. Art. 881.1, we may not review the sentences. Therefore, we deny defendants' request to review the presentence investigation report.